In the Matter of NORMAN L. MARKS, an Attorney, Respondent. ASSOCIATION OF THE BAR OF THE CITY OF NEW YORK, Petitioner.

First Department, July 5, 1944.

*S. C. Lewis* of counsel (*Einar Chrystie,* attorney), for petitioner.

*Walter M. Hinkle* of counsel (*Irving I. Goldsmith,* attorney), for respondent.

GLENNON, J. In the early part of 1942, four men ranging in age from about 26½ to 34 years, were about to be inducted into the United States Army pursuant to the Selective Service Law. Apparently they desired for various reasons to be assigned to duty near the city of New York. By prearrangement at different times they met the respondent who gave them to understand that through his influence they could be assigned to service in noncombatant branches of the army. Acting under his advice, each of these men, during the months of February and March, 1942, went to Fort Monmouth, New Jersey, where they enlisted. Respondent had pretended that in order to bring about this result he required money to be used for the purpose of improperly influencing certain persons. After their acceptance into the service, each of the four paid $250 or a total of $1,000, of which $900 was retained by the respondent. After the investigation leading up to the charges herein and before the commencement of the hearings, the respondent returned the $900.

On the hearing before the Referee each of the soldiers testified to the circumstances leading up to the payment of the various sums.

Respondent on his own behalf before the Official Referee, testified that he never requested any money; that he accepted it reluctantly; and that the moneys were paid to him as presents, gifts or gratuities. He admitted that he rendered no service to any of the four men who paid him the money, and further that he knew no officers at Fort Monmouth, and did not refer any of the men to any particular person at that place.

In his report the Official Referee stated in part:

" After consideration of the testimony it is my opinion that this money was paid under the belief that the respondent was able to render to these four boys services not alone in connection with their enlistment, but to get them special consideration, and that the moneys were paid with that understanding and at the request of the respondent.

" No reason appears why these four boys, who had never known the respondent prior to their calls upon him, should ask his assistance in connection with their enlistment. He led them to believe that he had sufficient influence to accomplish what they sought and get them the consideration that they believed money would buy.

" Three of them were brought to the respondent by Seifer who appears to have been the intermediary and pay-off man. Seifer's story as to his lack of knowledge of what the money was for I do not believe. If those payments were gratuities, as claimed by the respondent, it seems strange that each one of the boys found that $250 was the proper price to show their appreciation.

" There is no testimony showing that their appreciation was ever extended by word of mouth or in writing, nor is there any acknowledgment on the part of the respondent of the receipt of these moneys showing gratitude by the respondent.

" Furthermore, none of these moneys were handed directly by any of the four soldiers to this respondent, although it was delivered on a table by Seifer in their presence. * * *.

" I believe that the respondent's witness Seifer and he himself have testified falsely throughout. In my opinion there is not a word of truth in the respondent's story as to his having received these moneys as gratuities. Those payments were made by Seifer in the expectation of the four boys getting value received.

" Shortly before the hearing before me the respondent by his personal check to the order of Seifer gave back $900, although his answer admits the receipt of $850. The difference between the $900 and the $1,000 that was paid by the four boys Seifer seems to have retained for himself.

" Upon the entire proof it is my opinion that the charges have been sustained."

A careful examination of the record must lead to the conclusion that the Official Referee properly found " the charges have been sustained." Either the respondent obtained the various sums of money for improper purposes or he falsely represented that they were to be so used. The respondent should be disbarred.

MARTIN, P. J. (concurring). An Official Referee has reported the respondent guilty of having obtained sums aggregating $900 from four men, each of whom was subject to the provisions of the Selective Training and Service Act of 1940 and about to be inducted into military service.

The charges set forth in the petition allege that the moneys were paid upon the respondent's representations that, through his influence and efforts, the four prospective draftees would be assigned to service in noncombatant branches of the army; that they would not be sent on foreign service, and that he would use the moneys so paid to influence, improperly, other persons to assist him to accomplish these results.

The answer of the respondent admits the receipt of $850, further alleging, " which respondent accepted reluctantly, has been at all times, and still is, ready, willing and able to refund and in respect of which he has previously offered, and still offers, to do so."

A soldier called as a witness testified he was an officer of Adler, Rosenberg & Seifer, Inc., a firm dealing in furs. On January 28, 1942, the witness, who had been classified in 1-A and had passed his physical examination and expected to be inducted in about four weeks, had a conversation with Martin H. Goldberg, the insurance broker for the fur company. Goldberg was a friend of the respondent and he brought the witness to the respondent's office. The witness told the respondent he wanted to be close to home so that he could be in touch with his business. Respondent told the witness he would help him enlist at Fort Monmouth, New Jersey, but that " there would be some expenses involved ". He also told the witness that he could not enlist at Fort Monmouth unless he was " recom-

mended ''. The following day the witness again called on respondent and was told to go to Fort Monmouth; '' that everything was arranged '' and it would cost $250. The witness went to Fort Monmouth and enlisted in the Medical Corps.

A second soldier testified that he also was an officer of Adler, Rosenberg & Seifer, Inc. In a general conversation with his associates in that firm, he had learned that one of them had agreed to pay money to the respondent. Thereafter the witness was classified 1-A and late in February or early in March, 1942, accompanied by Seifer, he called at the respondent's office. He told respondent he would like to remain near New York for a time. The respondent sent him to an officer at the Army Base in Brooklyn, but there were no openings. Several days later the witness and Seifer again called on the respondent, who told the witness to go to Fort Monmouth and see an officer, whom he named and whose office he described. During this conversation, the respondent told the witness there would be some expense involved because '' a payment had to be made to someone at Fort Monmouth, New Jersey ''.

On that occasion Seifer gave the respondent $400 on behalf of his two associates. Seifer assured the respondent that the balance of $100 would be paid. The second soldier witness testified that this payment, on his behalf, was not a gift or a present '' but it was a payment in relation to obtaining my enlistment ''. He followed the respondent's instructions, went to Fort Monmouth and enlisted in the army on March 16, 1942. He did this despite the fact that his induction had been deferred until May. It is obvious that he enlisted two months prior to induction because he relied on special consideration as the result of respondent's intercession.

The third soldier who paid money to the respondent in connection with his enlistment was the son of an employee of Adler, Rosenberg & Seifer, Inc. He was classified 1-A in February, 1942, and during that month had lunch with his father and Seifer. Several weeks later, as the result of an appointment made by Mr. Seifer, the witness called upon the respondent. He testified that the respondent stated '' men were being stationed in the area close to New York and that I could be one of them probably for the duration ''. He was told to go to Fort Monmouth to see a certain officer and was given a rough map of the office, and told to enter a side door thereto. The respondent also stated that certain expenses were involved but none of the money was for him as '' the money had to be turned over to the correct people ''. Despite the fact that '' it was very

difficult, in fact almost impossible for anyone to go out and enlist at Fort Monmouth ", the respondent said he could get the witness " in there ". On March 3, 1942, the witness followed directions, went to Fort Monmouth and enlisted as a radio student. Two days later he again called on the respondent to report the result of his trip to Fort Monmouth. The respondent then brought up the subject of the " expenses " and said he was seeing some people that Saturday and would like the money.

The fourth soldier witness called by the petitioner was acquainted with the first soldier witness and Seifer and a patient for about eight years of the latter's brother, Dr. Samuel Seifer, a dentist. The witness had unsuccessfully sought to enlist and in March, 1942, had a talk with Dr. Seifer and later with Edward H. Seifer. The latter took the witness to the respondent's office, where the witness said he " was interested in enlisting in a non-combatant outfit, preferably something like the Medical Corps." Respondent said that the witness could enlist at Fort Monmouth, where he would have a chance to stay for a while. On March 23, 1942, the witness went to Fort Monmouth and saw the officer to whom respondent directed him, enlisted in the army and was assigned to the Medical Corps. Several days later the witness and Seifer called on the respondent at the latter's office. The witness had given Seifer $250, which the latter placed on the respondent's desk. The respondent, speaking of the sum of money so given, said " I think it should be more ".

Mr. Goldberg, the insurance broker, said he introduced the first soldier witness to the respondent and was present at the first meeting. He testified nothing was said about "expenses" at that time. He also admitted he introduced Edward H. Seifer to the respondent.

Mr. Edward H. Seifer was called as a witness by the respondent. He testified he gave $400 in cash to the respondent in the presence of the second soldier witness. This represented a payment of $250 for the first soldier witness and $150 for the second soldier witness. He also testified to payments of $250 each on behalf of the third and fourth soldier witnesses, both payments being made to respondent in the presence of the respective men.

In defense the respondent testified that he never requested any money; that he was merely trying to help friends of his friend Goldberg; that he accepted the money reluctantly; that

the moneys were paid to him as presents, gifts or gratuities. He admitted that he rendered no services to any of the four men who paid him the money. He said he did not consider the conversations in which they engaged as " legal services ". He also testified that he knew no officers at Fort Monmouth and did not refer any of the men to any particular person at that place.

On cross-examination, he was asked what he thought when the money was placed on his desk by Mr. Seifer. He said that as to the first gift he was " puzzled "; that he " couldn't appreciate what they were putting this money down for "; that he was " stunned " and it was " the first time a thing like that happened to me ". When questioned about the second payment, he said he was not as " stunned " as on the first occasion but that he was " surprised ", " shocked " and " dumbfounded ". He admitted discussing with his partner what disposition should be made of the money and that as to the first $400 received, it was agreed that it should not be deposited in a bank but should be used for office petty cash. Part of the last payments was given to respondent's wife to buy a fur cape from the firm of Adler, Rosenberg & Seifer, Inc.

In the opinion of the Official Referee the charges have been sustained. His finding is clearly supported by the evidence in this record. The testimony of the four soldiers establishes that the respondent demanded these moneys for alleged " expenses " to be paid to persons at Fort Monmouth to " fix " the careers of the soldiers for the duration of the war. In view of the respondent's testimony that he knew no one at Fort Monmouth; that he rendered no legal services; that he placed part of the money in his office petty cash account, paid an income tax thereon and gave the balance to his wife to buy a fur cape, it follows that he obtained the money by false representations.

The conduct of this respondent, particularly at a time when most of our people are cheerfully making the many sacrifices required of them, comes as a shock to this court. The respondent has directly interfered with the war effort by representing to four prospective members of the armed forces, and to others, that he could influence enlistments in noncombatant branches of the army, and that he could assist men in their efforts to remain close to their families and to their business. His acceptance of money from these men in connection with the aforesaid representations, under the guise of using it to bribe officers in the United States Army, is so reprehensible and so repugnant to the ethics and standards of the legal profession as to require his disbarment.

The respondent should be disbarred.

TOWNLEY, DORE and COHN, JJ., concur with GLENNON, J.; MARTIN, P. J., concurs in separate opinion.

Respondent disbarred.